UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                          Criminal No. 14-316 (RHK/FLN)

                    Plaintiff,

        v.                                         **REPORT AND**
                                                   **RECOMMENDATION**

Malcolm Jamel Lyons,

                    Defendant.

_____

Jeffrey Paulsen, Assistant United States Attorney, for Plaintiff.
John Brink for Defendant.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on January

14, 2015 on the following pretrial motions of Defendant Malcolm J. Lyons: (1) motion to suppress

statements (ECF No. 18), (2) motion to suppress search and seizure evidence (ECF No. 19), (3)

supplemental motion to suppress search and seizure evidence (ECF No. 38), and (4) second

supplemental motion to suppress search and seizure evidence (ECF No. 49). The matter was referred

to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule

72.1. At the hearing, the Government entered four exhibits into evidence[1] and called three

witnesses.[2] For the reasons that follow, the Court recommends that Defendant's motions be

---

[1]

    The Government's exhibit 1 is a search warrant, dated August 27, 2014, issued by a Hennepin County
    District Court judge to search apartment #203 at an apartment complex located on West 65th Street
    in Richfield, MN; exhibit 2 is a search warrant, dated August 27, 2014, issued by a Hennepin County
    District Court judge to search apartment #104 at an apartment complex located on West 65th Street
    in Richfield, MN; exhibit 3 is a search warrant, dated May 21, 2014, issued by a Hennepin County
    District Court judge to search apartment #203 at an apartment complex located on West 65th Street
    in Richfield, MN; and exhibit 4 is a collection of certificates purporting to show that a canine,
    Domino, is both a regionally and nationally certified narcotic detection dog.

[2]

    The first witness was Richfield Detective Joseph Edwards. The second witness was Richfield
    Detective Rian Jensen. The third witness was Minneapolis police officer Ricardo Muro.

**DENIED**.

## I. FINDINGS OF FACT

### A.      Robbery and discovery of firearms at Defendant's home on May 21, 2014

According to the Government, on May 21, 2014, two gang members attempted to rob Defendant at an apartment he shares with his girlfriend located at 840 West 65th Street #203 in Richfield, MN ("Apartment 203").[3] During the course of the robbery, Defendant was shot in the leg. After the gun discharged, the robbers fled and emergency personnel were called to the scene. Thereafter, Defendant was taken to the Hennepin County Medical Center ("HCMC") by ambulance.

When police arrived at the scene of the incident, the Government states that Defendant's girlfriend indicated that two handguns were located within the apartment. Officers subsequently obtained a warrant to search Apartment 203 in order to recover evidence related to the robbery and the shooting (the "May 21 warrant"). Pursuant to this warrant, officers found, among other things, a gun in an upper kitchen cupboard with Defendant's blood on it.

Later that evening, Richfield police officers Rian Jensen and Dustin Schwarze visited Defendant in the hospital to interview him regarding the events that occurred that night. Prior to questioning him, Schwarze read Defendant his *Miranda* rights. Defendant waived his rights and agreed to talk to Jensen and Schwarze about the incident. Defendant informed the officers that two people entered his apartment and attempted to rob him, and during this process he was shot in the leg. According to Jensen, Defendant appeared coherent throughout the interview, and he never requested a lawyer or asked the officers to stop the questioning. The interview lasted between ten

---

[3]      Defendant also rents a separate apartment unit in the same building as the apartment he shares with his girlfriend ("Apartment 104").

2

and twenty minutes.

After visiting with Defendant at HCMC, Jensen and Schwarze examined the pants Defendant was wearing when he was shot. The officers noted that there was only one bullet hole in the pants, which was inconsistent with the fact that Defendant's leg had both an entrance and an exit wound from the bullet. The officers also discovered gunshot residue on the inside of the pants. These findings, according to Jensen, led the officers to believe that Defendant was not shot as he claimed, but that Defendant's own gun discharged inside of Defendant's pants.

The following day, May 22, 2014, Jensen had a follow-up conversation with Defendant at the Richfield police station. Defendant had voluntarily gone to the police station in order to obtain his vehicle, which had been brought to the station pursuant to a search warrant. When asked about the single hole in his pants, Defendant stated that at some point the robber lowered the gun he had been pointing at Defendant. Defendant said that he then grabbed the robber's arm and pushed it downward. Defendant claimed that because his pants were saggy, the gun went down the inside of his pants and discharged. After answering all of Jensen's questions, Defendant left and went home. Jensen stated that Defendant was never read his *Miranda* rights on May 22, 2014.

**B.     Drug discovery at Defendant's home**

A few months later, Minneapolis police officer Ricardo Muro received information from a confidential reliable informant ("CRI") that narcotics were being packed and stored from inside Apartment 203. Muro arranged for the CRI to conduct a controlled narcotics transaction with Defendant. Under the surveillance of law enforcement officers, the CRI met with Defendant and exchanged pre-recorded funds for the narcotics. Sometime between August 25 and August 27, 2014, Muro arranged for Detective Amy Kilian of the Airport Police Narcotics Interdiction Unit to bring

her canine, "Domino," through the apartment building that houses Apartment 104 and Apartment 203. Kilian and Muro were able to enter the building because the lock on the back security door was not working properly; they were not granted entrance by the defendant or the building manager. According to Muro, once inside Domino indicated that narcotics were present in both apartment units. Based on the foregoing, Muro applied for, and was granted, warrants to search both Apartment 104 and Apartment 203 on August 27, 2014 (the "August 27 warrants"). Upon executing the warrants on August 28, 2014, officers discovered approximately 3.5 pounds of methamphetamine in Apartment 203.

Based on the aforementioned facts, Defendant was indicted on two counts: (1) being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and (2) possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Indictment, ECF No. 1. Defendant now seeks to (1) suppress the statements he made while at the hospital and the police station (ECF No. 18); (2) suppress any evidence obtained pursuant to the warrant to search Apartment 203 on May 21, 2014 (ECF Nos. 19 and 49); and (3) suppress any evidence obtained pursuant to the warrants to search Apartment 104 and Apartment 203 on August 28, 2014 (ECF Nos. 19 and 38).

## II. LEGAL ANALYSIS

### A.    Motion to suppress statements

Defendant first moves to suppress any statements, admissions, and/or answers he may have made prior to, at the time of, or subsequent to his arrest. ECF No. 18 at 1. The Government argues that Defendant does not have, and has not articulated, any basis to suppress any statements he may have made. Gov.'s Consolidated Resp. Mem. 4, ECF No. 26. It appears that the only statements

Defendant made to police officers occurred at HCMC on May 21, 2014 and at the police station on May 22, 2014.

Law enforcement officers must inform suspects of their *Miranda* rights before subjecting them to custodial interrogations. *United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012). "Failure to do so results in a violation of the suspect's Fifth Amendment rights and renders any statement gained from the violation inadmissible in the government's case-in-chief." *Id.* A custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." *United States v. Flores-Sandoval*, 474 F.3d 1142, 1147 (8th Cir. 2007). "The ultimate inquiry to determine custody for *Miranda* purposes is whether there was a formal arrest, or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* Custody depends on the totality of the circumstances, and the Eighth Circuit considers six factors when determining whether a person was in custody for purposes of the Fifth Amendment:

(1)    whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;

(2)    whether the suspect possessed unrestrained freedom of movement during questioning;

(3)    whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;

(4)    whether strong arm tactics or deceptive stratagems were employed during questioning;

(5)    whether the atmosphere of the questioning was police-dominated; or

(6)    whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). "The ultimate test is whether a reasonable person in that position would have felt free to end the interview." *United States v. Aldridge*, 664 F.3d 705, 711 (8th Cir. 2011).

With regards to the statements made while Defendant was at the hospital, the Court does not need to address whether Defendant was subjected to a custodial interrogation because Defendant effectively waived his *Miranda* rights. To be valid, a waiver of one's *Miranda* rights must be voluntary, knowing, and intelligent. *Miranda v. Arizona*, 384 U.S. 436, 445 (1966). At the hearing, Officer Jensen testified that before Defendant was questioned, Defendant was read his *Miranda* rights. Defendant explicitly stated that he understood his rights but was still willing to speak to the officers regarding the robbery and his gunshot injury. There is no evidence in the record that this decision was anything but knowing, voluntary, and intelligent. Jensen testified that Defendant appeared coherent and not under the influence of any medication. At no time did Defendant ask for a lawyer or request the questioning to stop. Therefore, even if Defendant were subjected to a custodial interrogation while he was at HCMC, he waived any right he had to remain silent.

With regards to the statements he made on May 22, 2014 while at the police station, the Court concludes that he was not "in custody" for purposes of the Fifth Amendment when he made the statements. Although it is unclear if Defendant was informed that the questioning was voluntary or that he was free to leave at any time, Defendant voluntarily went to the police station, he was never restrained from leaving the station, he voluntarily answered the questions Jensen asked him, no "strong-arm" tactics were used in persuading Defendant to talk to the officers, and Defendant was not placed under arrest after the questioning. Therefore, based on the totality of the circumstances, the Court concludes that a reasonable person in Defendant's position would have felt free to end the interview with Jensen at any time and leave. Accordingly, the Court finds that no Fifth Amendment violation occurred.

Based on the foregoing, the Court recommends that Defendant's motion to suppress statements (ECF No. 18) be denied.

B.      **Motions to Suppress Evidence**

1.      **May 21, 2014 Search Warrant**

Defendant seeks to suppress any physical evidence obtained as a result of a search and seizure pursuant to the May 21 warrant. *See* ECF Nos. 19 and 49; *see also* Gov. Ex. 3. Specifically, Defendant argues that the warrant was issued without a sufficient showing of probable cause in the supporting affidavit. ECF No. 19 at 1. Additionally, Defendant argues that although the search warrant application purported to request the search of Apartment 203, the warrant that was issued by the judge instead ordered the search of an apartment unit located at 7700 12th Avenue South #315 in Richfield, MN. ECF No. 49 at 1. In response, the Government contends that the warrant was supported by ample probable cause. ECF No. 26 at 4.

The warrant in question was issued based on an affidavit signed and submitted by Richfield Detective Joseph Edwards. Gov. Ex. 1. Edwards' warrant application stated that he had good reason to believe that firearms and ammunition would be found at "the premises described as: 840 West 65th Street Apartment #203" located in the city of Richfield, MN. *Id.* The accompanying affidavit stated that, among other things, officers responded to "840 West 65th Street Apartment #203" after it was reported that someone at the residence had suffered a gunshot wound. *Id.* Furthermore, the search warrant itself, which was issued by a judge of the Hennepin County District Court, states in two separate locations that the premises to be searched pursuant to the warrant was "840 West 65th Street Apartment #203" in Richfield, MN. *Id.* However, the final paragraph of the search warrant commands that Edwards search a different address "7700 12th Avenue South Apartment #315" in Richfield, MN. It is on this basis that Defendant argues that police officers had no authority to search Apartment 203. ECF No. 49 at 1–2.

Assuming without deciding that the search warrant lacked probable cause and did not

7

authorize the police to search Apartment 203, the Court concludes that evidence seized is nonetheless admissible under the good-faith exception to the exclusionary rule as articulated in *United States v. Leon*, 468 U.S. 897, 922 (1984); *see also United States v. Clay*, 646 F.3d 1124 (8th Cir. 2011) ("[T]he exclusionary rule should not be applied so as to bar the admission of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate, even if that search warrant is later held to be invalid." (citing *Leon*, 468 U.S. at 900)). The Eighth Circuit has held that a clerical error in a search warrant, such as an incorrect address, is not grounds to suppress evidence seized pursuant to the warrant under the good-faith exception to the exclusionary rule. *See United States v. Thomas*, 362 F.3d 805 (8th Cir. 2001). In *Thomas*, police officers searched the defendant's apartment at 3202 South 62nd Street. The search warrant, however, authorized the search of the defendant's former address, not the apartment that was actually searched. *Id.* at 806. Although the application and supporting affidavit stated that the premises to be searched was the South 62nd Street address, the officer drafting the warrant itself forgot to update the actual warrant with the defendant's new address and instead used defendant's previous address. *Id.* at 806–07. Neither the issuing judge nor the officer noticed the incorrect address on the warrant. *Id.* The Eighth Circuit reasoned that several factors justified applying the *Leon* exception to the exclusionary rule in such a situation: (1) the application and supporting affidavit both contained the correct address of the location to be searched; (2) there was no evidence of bad faith on the part of the officer obtaining the warrant; (3) the search was executed by the same officer who had prepared the affidavit, all but eliminating the chance the wrong location would be searched; and (4) the responsibility for this type of error in the warrant lies with the issuing judge. *Id.* at 808.

This reasoning applies with equal force in the present case. At the hearing, Officer Edwards

testified that the issued warrant was based on boilerplate language, and he forgot to change the address from a previous warrant that he had drafted. Edwards testified that he was not attempting to mislead the court and he believed he could search Apartment 203. He also stated that there was no risk that the wrong apartment would be searched because he personally executed the warrant. Additionally, the correct address to be searched was stated in the application and warrant in at least four other locations. Accordingly, the Court concludes that the present case is analogous to *Thomas*, and any evidence seized pursuant to the May 21 warrant should not be suppressed under the good-faith exception to the exclusionary rule.

Therefore, to the extent that Defendant seeks to suppress the evidence obtained from the search of Apartment 203 on May 21, 2014 (ECF Nos. 19 and 49), Defendant's motion should be denied.

**B.      August 27, 2014 Search Warrants**

Defendant also seeks to suppress any evidence obtained pursuant to the August 27 warrants, which gave law enforcement officers authority to search both Apartment 104 and Apartment 203 for evidence related to drug possession. ECF No. 38. A portion of the information in affidavits supporting the warrant applications to search Apartment 104 and Apartment 203 was based on the fact that a certified narcotics detection canine, "Domino," indicated that narcotics were inside both apartments. Gov. Exs. 1 and 2. According to the affidavits, Detective Kilian brought Domino to the apartment building located at 840 West 65th Street in Richfield, MN. Gov. Exs. 1 and 2. Upon entering the building, Kilian ran the dog past doors on the first floor without indicating the presence of narcotics. After sniffing the lower seam of the door of Apartment 104, however, Domino indicated the presence of narcotics from within the apartment. At the hearing, Officer Muro testified that although the supporting affidavits only state that Domino alerted to the presence of narcotics

in Apartment 104, Domino also positively alerted to narcotics at the door of Apartment 203. Muro further stated that he and Kilian were able to enter the building because the lock on the back security door was not working properly. They were not granted entrance by the building manager or another tenant—they simply opened the door and walked in because the door was unlocked at the time.

In post-hearing briefing, the Government stated that although Muro and Kilian entered through the unsecured back door, they also had the ability to enter the building through the front security door. Gov.'s Post-Hearing Mem. 2, ECF No. 51. According to the Government, Defendant's apartment building is equipped with a lockbox located next to the front door of the apartment. *Id.* The lockbox contains a key that unlocks the front security door of the apartment complex and is accessible to both the fire department and any police department patrol sergeant. *Id.* Thus, the Government stated that although officers entered through an unlocked back door, the officers could easily have gained entrance through the front security door by contacting a patrol sergeant. *Id.*

Defendant contends that any evidence obtained pursuant to searches authorized by the August 27 warrants should be suppressed because Domino's indication of narcotics within Apartment 104 and Apartment 203, which formed the basis for the warrant applications, was an unconstitutional "dog sniff" search pursuant to the recent Supreme Court decision in *Florida v. Jardines*, 133 S. Ct. 1409 (2013). ECF No. 38. In response, the Government claims that the warrants contained sufficient probable cause and that the dog sniff evidence was not illegally obtained. Gov. Consolidated Resp. Mem. 5–8, ECF No. 48; ECF No. 51 at 1–4.

The United States Supreme Court in *Jardines* held that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment." *Id.* at 1417–18. In *Jardines*, police officers, without a warrant, allowed a trained narcotics dog to sniff for drugs on the front porch of the defendant's house. After sniffing

the base of the front door, the dog positively identified the presence of drugs. Officers then sought and obtained a search warrant for the house, which led to the discovery of incriminating evidence. The defendant filed a motion to suppress the evidence obtained pursuant to the search warrant, arguing that the dog sniff of his front door was an unconstitutional warrantless search.

The *Jardines* Court first concluded that the front porch area was part of the home's curtilage—the area "immediately surrounding and associated with the home." *Id.* at 1414. Therefore, the officer's investigation took place in a constitutionally protected area. *Id.* at 1415. Second, the Court determined that the dog sniff was an unconstitutional search because the officers were not given permission to bring a narcotics dog to the defendant's front door, nor were they licensed to do so. *Id.* at 1415–17. The Court stated that while homeowners typically permit visitors to approach the home in order to knock on the front door and wait to be received, "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else." *Id.* at 1415–16. Therefore, the Court held that absent permission, there is no express or implied license that allows a police officer to explore the front of a person's house with a narcotics dog. *Id.* at 1416. Accordingly, because the officers brought a dog to conduct a search of a constitutionally protected area of the home without permission, the Court held that the sniff constituted an unlawful search under the Fourth Amendment, thus invalidating the search warrant that was issued based on the illegal search. *Id.* at 1417–18.

Prior to *Jardines*, it was well-settled Eighth Circuit precedent that individuals had no reasonable expectation of privacy in the common areas of an apartment complex. *See United States v. Scott*, 610 F.3d 1009, 1016 (8th Cir. 2010) (holding that a dog's sniff of an apartment door frame from a common hallway did not constitute a search subject to the Fourth Amendment). In the time since *Scott*, the Supreme Court decided *Jardines*. The Eighth Circuit, however, has explicitly

declined to address the impact of *Jardines* on its holding in *Scott*. *See, e.g.*, *United States v. Givens*, 763 F.3d 987, 992 (8th Cir. 2014).

In the present case, the Court need not decide whether *Jardines* has overruled the Eighth Circuit precedent regarding whether a dog sniff of an apartment unit's door frame constitutes a search under the Fourth Amendment. Assuming without deciding that the Domino's positive identification of narcotics within Apartment 104 and Apartment 203 was an unconstitutional search, the Court concludes that even absent the dog sniff evidence, the warrants issued to search Apartment 104 and Apartment 203 would have been supported by probable cause.

As the Supreme Court has noted, the exclusionary rule not only excludes evidence obtained as a direct result of an illegal search or seizure, but it also extends to evidence that is found to be derivative of such an illegal search. *Segura v. United States*, 468 U.S. 796, 804 (1984). However, evidence is not suppressed pursuant to the exclusionary rule when the connection between the constitutional violation and the evidence is "so attenuated as to dissipate the taint." *United States v. Swope*, 542 F.3d 609, 613 (8th Cir. 2008) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)). Such attenuation exists when the Government can show that the evidence was acquired through a source independent of the constitutional violation. *Id.* In other words, the exclusionary rule does not apply when the evidence would have been independently discovered from activities unrelated to the initial constitutional violation. Therefore, the question in this case becomes whether the warrant can serve as an independent source for the physical evidence seized from Apartment 104 and/or Apartment 203.

In *Murray v. United States*, 487 U.S. 533, 542 (1988) the Supreme court wrote that a warrant obtained after an illegal search is not an independent source for the evidence, "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if

information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." The Eighth Circuit has interpreted the foregoing language to mean only that the Court must answer the following two questions in the affirmative in order to find that the warrants were an independent source:

(1)   Would the police have applied for the warrant had they not acquired the tainted information?

(2)   Do the application affidavits support probable cause after the tainted information has been redacted from them?

*Swope*, 542 F.3d at 613–14. The Eighth Circuit has stated that when courts consider the second prong, the question to ask is "whether removing the tainted information also removes the basis for probable cause." *Id.* at 614.

The Court here concludes that under prong one, officers would have applied for the search warrants even if they had not conducted the dog sniff with Domino. Prior to the dog sniff outside Apartment 104 and Apartment 203, Officer Muro had received information from a CRI that narcotics were being stored and packaged from inside the two apartments. *See* Gov. Exs. 1 and 2. The CRI also participated in a controlled purchase of narcotics from Defendant while being surveilled by police officers. It is clear to this Court that the dog sniff evidence was only one of many pieces of evidence that law enforcement had collected related to drug activity in Apartment 104 and Apartment 203, and officers would have sought the warrants even if there had been no positive indication for narcotics by Domino. Accordingly, the Court determines that prong one is met.

As to prong two, the Court finds that even if the evidence of Domino's positive indication for drugs inside Apartments 104 and 203 were removed from the supporting affidavits for the two search warrants, probable cause still existed to issue warrants to search the two apartments based

13

on the other evidence discussed within the affidavits. Officer Muro averred the following facts in

his search warrant affidavits:

- A CRI informed Muro that narcotics were being stored and packaged from inside both Apartments 104 and 203. The CRI had a broad knowledge of narcotics and illicit drug trafficking trade and had "provided information that [had] been used to obtain prior search warrants that . . . led to the arrest of narcotics traffickers and the seizures of narcotic[s], weapons, ammunition, property and amounts of money." Gov. Ex. 1 at 2; Gov. Ex. 2 at 2.

- In the month prior to the search warrant applications, the CRI provided information to Muro regarding the distribution and possession of methamphetamine and marijuana in the city of Richfield and surrounding areas. Specifically, the CRI identified Defendant as the individual supplying the narcotics. The CRI also informed Muro that he had observed Defendant in possession of a black handgun numerous times. Gov. Ex. 1 at 2; Gov. Ex. 2 at 2. Through Muro's investigation, Muro learned that Defendant was a convicted felon involved in a drive-by shooting.

- At the request of Muro, the CRI contacted Defendant and arranged a narcotics transaction in exchange for U.S. currency. Under the direction and surveillance of Muro and other law enforcement officers, the CRI met Defendant at a pre-determined location and exchanged pre-recorded funds for the narcotics. Gov. Ex. 1 at 2; Gov. Ex. 2 at 2.

- Muro was able to confirm that Defendant resides in Apartment 104. Muro also confirmed that Defendant had access and stayed with his girlfriend in Apartment 203. When investigators went to interview Defendant's girlfriend in an unrelated matter, they encountered Defendant inside Apartment 203 even when the girlfriend was not present. Gov. Ex. 1 at 2; Gov. Ex. 2 at 2.

- The CRI informed Muro that he had been present and observed Defendant in possession and control of narcotics in Apartment 203. The CRI also stated that he had observed Defendant selling narcotics to other individuals within the last 72 hours. Gov. Ex. 2 at 2.

The Court concludes that the above facts are sufficient to establish probable cause to search both

Apartment 104 and Apartment 203. Search warrants are valid when probable cause supports a

neutral and detached judicial officer's conclusion that evidence of a crime may be found at the

location identified in the search warrant application. *Warden v. Hayden*, 387 U.S. 294 (1967).

Probable cause means that "there is a fair probability that contraband or evidence of a crime will be

found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "Judges may draw

reasonable inferences from the totality of the circumstances in determining whether probable cause

exists to issue a search warrant . . . ." *United States v. Alexander*, 574 F.3d 484, 490 (8th Cir. 2009) (quoting *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007)).

Given the CRI's reports to Officer Muro that he observed Defendant selling narcotics out of both Apartment 104 and Apartment 203 and that Defendant was in possession of a handgun, as well as the fact that law enforcement surveilled Defendant selling narcotics to the CRI, there was a fair probability that evidence of crimes related to the sale of narcotics and other illegal controlled substances would be found in Apartment 103 and Apartment 104. Accordingly, the Court concludes that the applications for the search warrants would have been supported by probable cause even after the information obtained from the dog sniff of the doors of Apartment 104 and Apartment 203 were removed from the supporting affidavits. Thus, the warrant served as an independent source for any physical evidence that was discovered at Apartment 104 and/or Apartment 203 on August 28, 2014.

Therefore, the Court recommends that Defendant's motions to suppress evidence obtained pursuant to the search warrants signed on August 27, 2014 (ECF Nos. 19 and 38) be denied.

## III. RECOMMENDATION

Based upon the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Defendant's motion to suppress statements (ECF No. 18) be **DENIED**;

2.      Defendant's motion to suppress evidence obtained as a result of search and seizure (ECF No. 19) be **DENIED**;

3.      Defendant's supplemental motion to suppress any evidence obtained as a result of any illegal searches or seizures (ECF No. 38) be **DENIED**;

4.      Defendant's second supplemental motion to suppress search and seizure evidence (ECF No. 49) be **DENIED**.

DATED: January 22, 2015                              *s/Franklin L. Noel*

FRANKLIN L. NOEL
United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **February 6, 2015**, written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **February 6, 2015** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.